IN THE MATTER OF:  APPEAL OF:  IBM CREDIT CORPORATION FROM THE DECISION OF THE DURHAM COUNTY BOARD OF COUNTY COMMISSIONERS CONCERNING THE VALUATION OF BUSINESS PERSONAL PROPERTY FOR TAX YEAR 2001

No. COA08-1514

(Filed 8 December 2009)

**Taxation— property—valuation of leased computer equipment—depreciation—functional and economic obsolescence**

The Court of Appeals reversed the final decision of the Property Tax Commission regarding Durham County's valuation of 40,779 pieces of leased computer equipment for business personal property taxes in tax year 2001. The case was again remanded to the Commission for a reasoned decision with regard to what amount of depreciation should have been deducted from the valuation to account for functional and economic obsolescence due to market conditions.

Appeal by IBM Credit Corporation from Final Decision entered 29 August 2008 by the North Carolina Property Tax Commission. Heard in the Court of Appeals 8 June 2009.

*Manning Fulton & Skinner, P.A., by Michael T. Medford and Judson A. Welborn, for taxpayer appellant.*

*Durham County Attorney S.C. Kitchen for County of Durham appellee.*

HUNTER, JR., Robert N., Judge.

IBM Credit Corporation ("IBM Credit") appeals from a final decision of the Property Tax Commission (the "Commission") upholding

IN RE APPEAL OF IBM CREDIT CORP.

[201 N.C. App. 343 (2009)]

Durham County's valuation of 40,779 pieces of leased computer equipment for business personal property taxes in tax year 2001. This Court previously remanded this matter to the Commission for reconsideration because the Commission did not properly apply the burden of proof framework mandated by *In re Appeal of IBM Credit Corp.*, 186 N.C. App. 223, 650 S.E.2d 828 (2007), *aff'd*, 362 N.C. 228, 657 S.E.2d 355 (2008) [*IBM Credit I*]. We reverse and remand.

## FACTS

In *IBM Credit I*, we observed that IBM Credit timely filed its business personal property listings with the Durham County Tax Office for the tax year 2001. As of 1 January 2001, IBM Credit leased 40,779 pieces of computer and computer-related equipment to 364 customers in Durham County. The leasing process was structured so that IBM Credit's customers would negotiate a price for a particular piece of equipment with a vendor. This acquisition cost would be paid by IBM Credit to the vendor, and IBM Credit in turn would typically lease the equipment to the customer for a 24-, 36-, or 48-month term while charging interest on the acquisition costs and establishing a "residual value" for the equipment at the initiation of the lease.

To assess the value of IBM Credit's 40,779 pieces of computer and computer-related equipment, Durham County applied Schedule U5 of the 2001 Cost Index and Depreciation Schedules in the 2001 Durham County Business Personal Property Listing Forms. This manual was prepared by the North Carolina Department of Revenue to assist county tax appraisers in valuing business personal property. The transmittal memorandum accompanying these schedules contained the following paragraph regarding the schedule's proper use by county tax appraisers:

> These schedules have been prepared by this office as a general guide to be used in the valuation of business personal property utilizing the replacement cost approach to value. It is important to remember that the schedules are only a guide. There will be situations where the appraiser may need to make adjustments for additional functional or economic obsolescence, or for other factors.

After Durham County's tax appraiser applied Schedule U5 without further adjustment to determine a value of $144,277,140.00 for IBM Credit's equipment, IBM Credit appealed to the Durham County Board of County Commissioners requesting an adjustment for additional functional or economic obsolescence. Durham County made

no adjustment, and a subsequent appeal was made to the Commission in which IBM Credit contended that the value of its equipment was only $96,458,707.00. The Commission took extensive evidence, and affirmed Durham County's valuation of $144,277,140.00.

IBM Credit then appealed to this Court, which reversed and remanded the matter to the Commission on the grounds that the Commission's prior order had failed to properly employ the burden of proof required in tax appraisal cases. *See IBM Credit I*, 186 N.C. App. 223, 650 S.E.2d 828. In that appeal, the burden-shifting analysis that the Commission was to follow on remand was detailed as follows:

1. *Ad valorem* tax assessments by a county are presumed to be correct. *In re Appeal of Amp, Inc.*, 287 N.C. 547, 562, 215 S.E.2d 752, 761 (1975).

2. A taxpayer may rebut this presumption by "produc[ing] 'competent, material and substantial' evidence that tends to show that: (1) [e]ither the county tax supervisor used an arbitrary method of valuation; or (2) the county tax supervisor used an illegal method of valuation; and (3) the assessment substantially exceeded the true value in money of the property." *Id.* at 563, 215 S.E.2d at 762 (emphasis omitted).

3. Once a taxpayer produces sufficient evidence to rebut the presumption, the burden shifts to the taxing authority to show that its "methods [do] in fact produce true values[.]" *In re Southern Railway*, 313 N.C. 177, 182, 328 S.E.2d 235, 239 (1985).

On remand from *IBM Credit I*, the Commission allowed additional briefing, but took no new evidence. The Commission then issued a second final decision, which again upheld Durham County's tax appraisal of $144,277,140.00. IBM Credit timely filed notice of this current appeal.

STANDARD OF REVIEW

Section 105-345.2(b) of our General Statutes sets forth the applicable scope of review in this case, and requires this Court "[s]o far as necessary to the decision and where presented, . . . [to] decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action." N.C. Gen. Stat. § 105-345.2(b) (2007). After deciding essential questions of law, this Court is authorized, if necessary, to "remand the case for further proceedings[.]" *Id.*

DISCUSSION

At the outset of the Commission's hearing, Durham County produced evidence to justify its assessment, which applied the acquisition costs of IBM Credit's equipment to the percentages contained in Schedule U5. Without any other evidence to the contrary, this would justify the Commission finding that the "true value" of IBM Credit's equipment was obtained, and this presumption of correctness was in fact relied upon by the Commission. *Amp., Inc.*, 287 N.C. at 562, 215 S.E.2d at 761.

The evidence presented by Durham County to the Commission included the introduction of Schedule U5 and its transmittal memorandum together with exhibits showing the mathematical application of the schedule. In addition, Durham County presented the testimony of David B. Baker of the Department of Revenue, Property Tax Division, who testified that Schedule U5 was developed in 1994 by the Department of Revenue based upon an unnamed Property Tax Commission case heard at that time. He explained that the schedule was premised upon a five-year life for computer equipment, and originally provided for a fifteen percent residual value at the end of the five-year period. However, the residual value was reduced from fifteen percent to ten percent.

The Commission found that Durham County applied this revised five-year depreciation schedule to IBM Credit's equipment. In particular, the Commission found that "Durham County used the original cost listed by IBM Credit on its business personal property listing by year for the computer and computer-related equipment and then applied Schedule U5 to arrive at the final value for each listing." The Commission also found that this approach was "*similar* to the cost approach to value computer and computer-related equipment." (Emphasis added.) The Commission further found that

> [w]hen using Schedule U5, Durham County used a method of appraisal that accounts for changes in the computer industry. In particular, Schedule U5 takes a thirty percent deduction for functional and economic obsolescence. Thereafter, a straight line depreciation is taken for the next five years with a residual value of ten percent, until the property is no longer listed for taxation.

Based upon these and other findings, which to some extent are repetitive, the Commission reached the conclusion of law that Durham County met its "burden."

**IN RE APPEAL OF IBM CREDIT CORP.**

[201 N.C. App. 343 (2009)]

The Commission's Final Decision is not clear as to which "burden" Durham County has met. For purposes of our analysis we will assume, even though the Commission does not expressly designate, that the Commission found Durham County met both its initial *prima facie* case and the burden of proof on the ultimate issue. The failure of the Commission's decision to explicitly make these findings is problematic for this Court on review. Had the Final Decision adequately tracked the detailed burden-shifting analysis required by *IBM Credit I* and our case law, this assumption would not be necessary. Nonetheless, we agree with the Commission that the quantum of evidence produced by the County was sufficient to establish a presumption of correctness for the Durham County tax appraisal values—though Durham County was not under an affirmative duty to present extensive evidence in order to receive this initial presumption.

In response to Durham County's presumption of correctness, IBM Credit argues that Schedule U5 does not produce a "true value" or "fair market value" for its equipment, because the schedule does not properly account for functional or economic obsolescence present in the 2001 computer and computer equipment market. IBM Credit contends in particular that the County's appraised values are illegal or arbitrary, because the appraiser did not follow the requirements of N.C. Gen. Stat. § 105-283 (2007)[1] in considering "the effect of obsolescence on the property."

To support this argument, IBM Credit employed NACOMEX U.S.A., Inc. ("NACOMEX") to determine the value of its computer and computer-related equipment. Robert J. Zises, President of NACOMEX, was stipulated to be an expert in computer appraisals and the computer market. As part of its business, NACOMEX maintains a database of "transactional sales observations" covering a period in excess of ten years reflecting secondary sales (brokerages sales) of computer and computer-related equipment. NACOMEX maintains this database as a resource of providing computer valuation information to various clients who use the information to establish values for their tangible property.

---

1. "All property, real and personal, shall as far as practicable be appraised or valued at its true value in money. When used in this Subchapter, the words "true value" shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used." N.C.G.S. § 105-283.

**IN RE APPEAL OF IBM CREDIT CORP.**

[201 N.C. App. 343 (2009)]

Mr. Zises used a subset of this database to develop depreciation tables for IBM Credit in determining a value for the computer and computer-related equipment in issue. As explained in his appraisal report ("NACOMEX report"), Mr. Zises developed these depreciation tables using the "market" or "sales comparison approach" rather than the "cost" or "income" approach, because in his opinion it was the best method to appraise the property. By applying the depreciation tables developed by Mr. Zises, IBM Credit determined the aggregate market value of its equipment to be $96,458,707.00.

In addition to the values obtained from the NACOMEX report, IBM Credit argues that the record is uncontradicted that rapid technological changes in the computer industry causes rapid decreases in the market value of computer equipment. IBM Credit contends that this fact is unaccounted for in Schedule U5. In support of this contention, IBM Credit cites the Commission's decision in *In re Appeals of Northern Telecom*, N.C. St. Tax Rep. (CCH) ¶201-813 (May 20, 1994), which held that values obtained using a former version of Schedule U5 were deficient because the assessor "fail[ed] to consider market information about the prices of new and used equipment in the taxpayer's industry." *In re Appeals of Northern Telecom*, N.C. St. Tax Rep. (CCH) ¶201-813 at Conclusion of Law No. 1 (May 20, 1994). While the version of Schedule U5 found deficient in *Northern Telecom* has since been modified, IBM Credit maintains that the modified version still does not accurately reflect the value at which computer property is sold in the marketplace. IBM Credit cites the testimony of the Durham County expert who developed Schedule U5 in support of this contention. That expert, Mr. Baker, testified before the Commission that the depreciation tables were not based on actual market purchases and sales.

Although the Commission does not explicitly state what effect, if any, all this evidence has on the legal presumption of correctness, for purposes of this decision we hold that it is " 'competent, material and substantial' evidence *tending to show* that "the county tax supervisor used an arbitrary method of valuation" which led to "the assessment substantially exceed[ing] the true value in money of the property." *Amp, Inc.*, 287 N.C. at 563, 215 S.E.2d at 762 (emphasis omitted) (internal quotation marks omitted). Therefore, the burden of persuasion and going forward with evidence that the methods used do in fact produce "true value" shifts to Durham County. *Southern Railway*, 313 N.C. at 182, 328 S.E.2d at 239; N.C.G.S. § 105-283.

**IN RE APPEAL OF IBM CREDIT CORP.**

[201 N.C. App. 343 (2009)]

The critical determination at the final stage of the burden shifting analysis is whether the tax appraisal methodology adopted by the tax appraiser is the proper "means" or methodology given the characteristics of the property under appraisal to produce a "true value" or "fair market value." N.C.G.S. § 105-283. While this question may be answered by resorting to experts or treatises, the burden shifting analysis also requires the trier of fact to test the validity of the appraisal premises underlying the appraisal methodology used. As our Supreme Court stated in *Southern Railway*, "it became the Commission's duty to hear the evidence of both sides, to determine its weight and sufficiency and the credibility of witnesses, to draw inferences, and to appraise conflicting and circumstantial evidence, all in order to determine whether the Department met its burden." *Southern Railway*, 313 N.C. at 182, 328 S.E.2d at 239.

While the Commission found that Durham County had met its burden, its final decision fails to adequately address key issues necessary to arrive at the ultimate decision required: What is the market value of the property being appraised? N.C.G.S. § 105-283. These omissions result in conclusions which lack evidentiary support and are therefore arbitrary and capricious.

First, there is no discussion in the final decision of why the cost approach, as opposed to the sales comparison or income approach, is an appropriate means to appraise this property. By relying primarily on the application of Schedule U5, the final decision fails to address a fundamental appraising issue—which approach to value is appropriate in light of all the facts and circumstances?

Here, the taxpayer presented a reasoned alternative approach to the method used by the county tax appraiser. In such a circumstance, one would expect the Commission to evaluate the methodology presented by the parties based upon uniform appraising standards and to find which approach to value is the appropriate approach. The fact that the final decision lacks this evaluation supports the appellant's contention that the Commission acted arbitrarily.

Second, there is no discussion in the final decision of why the income method of appraising was not employed or used to modify the other approaches. This omission is troubling given that the property being appraised is income-producing. Normally, where more than one approach to value is being considered, some synthesis of values is produced to explain, based upon a uniform appraisal standard, why

the approach selected was correct and how the appraisal dispute should be resolved.

Third, the Commission's final decision fails to address a fundamental issue in the application of any trending or depreciation schedule—the useful life of the property under appraisal. It is uncontested from the record that the useful life of seventy-five to eighty percent of the property being appraised is three years. This useful life is based upon the uncontested fact that IBM Credit's property is only leased for three years by most lessees at which time the property reaches its residual value. It is similarly uncontested from the record that Schedule U5 assumes a useful life of the property as being five years before it reaches its residual value. While it is possible to assume that computer equipment could have a five-year useful life as part of an operating business, such assumption is clearly rebutted by IBM Credit, which leases the computer equipment that it owns for only three years.

Fourth, the final decision fails to explain the valuation premises behind the thirty percent deduction in year one of Schedule U5. While the Commission found that Schedule U5 takes a thirty percent deduction for functional and economic obsolescence, it is unclear from the record whether the thirty percent deduction is attributable to just these two factors alone. Put differently, it is unclear whether this thirty percent also includes deductions for physical deterioration. Moreover, assuming this thirty percent includes deductions for physical deterioration, it is also unclear how the deduction for physical deterioration, functional obsolescence, and external obsolescence are allocated among the thirty percent. Because Durham County has the burden of proof at this stage of evaluation, it is incumbent upon the county to show the Commission the premises which underlie this thirty percent figure, and how it accomplishes the valuation goal of properly accounting for depreciation factors such as functional obsolescence.

Fifth, the Commission does not address why the facts and circumstances of the valuation do not require the appraiser to make adjustments for additional functional or economic obsolescence or for other factors. The transmittal memorandum sending the schedules developed by the Department of Revenue to county tax appraisers clearly signals to the county tax appraisers that "[t]here will be situations where the appraiser may need to make adjustments for additional functional or economic obsolescence, or for other fac-

**IN RE APPEAL OF IBM CREDIT CORP.**

[201 N.C. App. 343 (2009)]

tors." Moreover, it is unclear what relationship the thirty percent depreciation figure has with the county appraiser's need to consider circumstances which would call for additional depreciation as provided for in the guidelines. Where the taxpayer calls to the attention of the appraiser and the Commission facts and circumstances which require special consideration of additional factors, the decision of the county tax appraisers must be evaluated and explained. The rejection of the additional depreciation argument may be justified in some way, but the final decision does not explain why or upon what facts this conclusion would be reached.

Finally, the Commission's finding that Schedule U5 is similar to the cost approach to value is unsupported. The Commission cites the NACOMEX report as its authority for this proposition. In the NACOMEX report, Mr. Zises explains how the calculation of depreciation is measured in the cost approach:

> The cost approach commonly measures value by estimating the current cost of a new asset, then deducting for various elements of depreciation, including physical deterioration and functional and external obsolescence to arrive at "depreciated cost new." The "cost" may be either reproduction or replacement costs. The logic behind this method is that an indication of value of the asset is its cost (reproduction or replacement) less a charge against various forms of obsolescence such as functional, technological and economic as well as physical deterioration if any.

> Thus:    Current Cost of Replacement or
>              Reproduction New
>                    less
>            Physical Deterioration
>                  · less
>            Functional Obsolescence
>                    less
>            External Obsolescence

>                results in
>            Fair Market Value

This evidence does not support the Commission's conclusions. Neither Durham County nor the Commission used the method described by Mr. Zises as the "cost approach" method. It is uncontested that the county started its evaluation by using historical costs as its starting point instead of cost of replacement or reproduction

new. There is no evidence to suggest that Schedule U5 or the county considers the cost of replacement or reproduction new for this property. No evidence was introduced to provide these figures for the Commission. Indeed, Schedule U5 suggests that the starting point for the cost method the Department of Revenue uses is to take the historical cost and apply a trending factor as contained in the tables to obtain reproduction cost new. This appears to miss a critical step in the appraisal analysis, particularly when technological improvements in the equipment being trended, such as computers, may have all the utility of the machine being appraised but sell for less money than the subject machine cost several years previous. Historical costs simply capture the starting value. Replacement cost new for similar capacity computer machines are the cost to replace identical equipment in the current market.

Altogether, this controversy involves two drastically differing methods for depreciating IBM Credit's computer equipment. In considering depreciation, two cautions relevant to our consideration are reflected in the discussion of "Valuation Depreciation and Accounting Depreciation" in *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets* by Machinery and Technical Specialities Committee of the American Society of Appraisers.

First, the treatise advises:

> Although USPAP requires that all three approaches to value be considered, the valuation of certain assets or the valuation premise under consideration may make the use of all three approaches impractical. . . . The cost approach, without sufficient research and quantification of depreciation and obsolescence, may not accurately reflect the fair market value of a particular asset.

Secondly, the treatise advises:

> Depreciation is another term that appraisers use differently from nonappraisers. In particular the valuation concept of depreciation differs from the accounting concept of depreciation. Depreciation for valuation purposes is the estimated loss in value of an asset, compared with a new asset; appraisal depreciation measures value inferiority that is caused by a combination of physical deterioration, functional obsolescence, and economic (or external) obsolescence.

**IN RE APPEAL OF IBM CREDIT CORP.**

[201 N.C. App. 343 (2009)]

It is important for the appraiser to understand that the accounting depreciation process is one of cost allocation only. It is not a method of valuation. Because a company's fixed assets are not held for resale, there is no attempt to reflect any change in the market value of the assets. As depreciation is calculated from period to period, it is added to an accumulated depreciation account. Depreciation for accounting purposes may be thought of as a mathematical procedure for recovering the original cost of an asset in consistent installments over a specified period.          :

Because Schedule U5 appears to mirror accounting depreciation methods and not valuation depreciation methods, its applicability in this case without justification is suspect, and the Commission's finding that Schedule U5 properly provides for "functional and economic" obsolescence is not supported by evidence in the record.

The Commission's final decision contains the following argument: The Department of Revenue's Schedule U5 is legal and typically used by all 100 counties. Durham County used the Department of Revenue's Schedule U5, which is based upon the cost method of valuation, and the cost method of valuation contains depreciation elements which deduct value for "obsolescence" and "functionality." Schedule U5 therefore produces a market value or true value of the property appraised.

However, if this contention prevails, then tax appeals would simply be limited to determining whether or not the proper government schedule was employed. This is not what is contemplated in the burden shifting analysis required by this Court in *IBM Credit I* or by case law.

The Commission found that the evidence produced by Mr. Zises was flawed with regard to several factors. These factors include the failure of Mr. Zises to consider use of the computers in the market; design factors inherent in IBM Credit's equipment that impair the equipment's desirability or usefulness in the current market; and criticisms of the use of the subset of data upon which the depreciation tables used by Mr. Zises were obtained. For purposes of our review, we do not have to determine whether these findings are supported by the evidence or whether the values produced by Mr. Zises' depreciation tables are accurate.

In appraising IBM Credit's property, Durham County did not meet the statutory standards required of N.C.G.S. § 105-283. In reviewing the methods applied by Durham County, we hold that the county did

not make adequate deductions for depreciation by applying Schedule U5 and its transmittal instructions. The failure to make additional depreciation deductions due to functional and economic obsolescence due to market conditions results in an appraisal which does not reflect "true value." The decision of the Commission upholding the appraisal is unsupported by substantial evidence based upon a review of all the evidence in the record. Because we are not a fact-finding body, we do not make a finding as to the proper amount of additional depreciation deduction to be applied upon remand. We therefore reverse the Final Decision of the Commission, and again remand to the Commission for a reasoned decision with regard to what amount of depreciation deduction should have been deducted from the valuation to account for functional and economic obsolescence due to market conditions.

Reversed and remanded.

Chief Judge MARTIN and Judge STEPHENS concur.