ELMORE, Judge.
 

 *681
 
 Cabarrus County appeals from the Final Decision of the North Carolina Property Tax Commission lowering the assessed property values for Tax Years 2012 and 2013 to the values urged by the taxpayer, Corning Inc. The County argues that the Commission's Final Decision is not supported by competent, material, and substantial evidence, and is otherwise affected by errors of law. We affirm.
 

 I. Background
 

 Corning owns and operates a large fiber optic manufacturing facility in Cabarrus County. It was constructed in 1997 when the technology for manufacturing optical fiber required specific design features, such as a four-story layout, interior partitions, and numerous draw towers penetrating multiple floors of the building. Due to market conditions in the fiber optic industry, the facility was shuttered in 2002. Corning resumed production on a limited basis in 2010 as the only major optical fiber company to survive the telecom bust. Around that same time, however, the technology for manufacturing optical fiber changed, eliminating the
 
 *682
 
 need for the multi-story building design and substantially reducing the space required for manufacturing.
 

 The County initially assessed the property at a value of $172,218,270 for each of the Tax Years 2012 and 2013. On appeal to the Cabarrus County Board of Equalization and Review, the County Board lowered the assessed values to $147,609,250 and $152,183,290 for Tax Years 2012 and 2013, respectively. Corning then appealed to the North Carolina Property Tax Commission, arguing that (1) the County used an arbitrary or illegal method of appraisal in reaching its assessed values, (2) the County assigned values to the subject property that substantially exceeded its true value in money, and (3) the County's assessments were significantly greater than those of other locally assessed property.
 

 At the hearing, Corning offered an appraisal report prepared by Fitzhugh L. Stout, who also testified as an expert in industrial real estate appraisal. Mr. Stout explained that he valued the property for alternative industrial use because "there is no demand for either building or buying a fiber optic manufacturing facility." Using a blended cost-sales approach, he assigned values of $26,370,000 and $30,490,000 for Tax Years 2012 and 2013, respectively. Corning also presented the expert testimony of John T. Cashion, an industrial real estate broker. Based on the industrial attributes of the property and the useful area to a likely buyer, Mr. Cashion testified that he would have
 
 *819
 
 marketed the property for $15,000,000 or $16,000,000.
 

 In support of its assessments, the County offered the expert testimony of its tax administrator, J. Brent Weisner. Mr. Weisner opined that the property was "special-purpose" property, and he valued it under the cost approach. In addition, the County contracted with Michael P. Berkowitz and Thomas B. Harris, Jr. of T.B. Harris, Jr. & Associates, Inc., to provide a retrospective valuation of the property as of 1 January 2012. Their expert testimony and written appraisal report, which included a $148,890,000 valuation for Tax Year 2012, was also received at the hearing. They did not establish a value for Tax Year 2013.
 

 In its Final Decision, the Commission determined that the County's valuation methods were arbitrary or illegal based, in part, on the following findings of fact:
 

 10. When determining the market value for the subject property, an appraiser should rely upon the appraisal approach that will best determine the market value for the subject property.
 

 ....
 

 *683
 
 15. When relying on the cost approach, Cabarrus County classified the subject property as a special-purpose or special-use property since Corning was using the property for its intended purpose. As such, Cabarrus County appraised the subject property based on Corning's use of the subject facility, which caused the County to implicitly value the subject property at the subjective worth to Corning and not at the objective value to a willing buyer.
 

 16. When arriving at the assessments for the subject property, the County's application of the 2012 schedules of values, standards, and rules to determine the values assigned to the subject property was flawed when the County's schedules of values, standards, and rules provided no category for the assessment or appraisal of the subject facility as special-purpose property.
 

 17. Cabarrus County used an arbitrary method to value the subject property as [of] January 1, 2012 and January 1, 2013 when it categorized the subject facility as a special-purpose property.
 

 18. Cabarrus County failed to consider acceptable appraisal methodology to determine the loss in value due to economic and functional obsolescence related to the subject property when its method of appraisal considered all costs that added no value to the subject property given that the building is not a modern facility, there is obsolescence associated with the multiple-level floor layouts, and there is building area that is still in shell condition.
 

 19. Cabarrus County's arbitrary cost approaches, and the results thereof, do not constitute the market values for the subject property as of January 1, 2012, and January 1, 2013.
 

 ....
 

 22. To arrive at the market value for the subject property as of January 1, 2012 and a market value for the subject property as of January 1, 2013, Mr. Stout determined the highest and best use of the subject property, as if vacant, would be holding the property for future development for an industrial use; and when considering that the subject
 
 *684
 
 property is improved with an industrial facility, the continuation of this use is concluded to be financially feasible.
 

 ....
 

 26. Mr. Stout determined the market value for the subject property to be $26,370,000 as of January 1, 2012, and the market value for the subject property to be $30,490,000 as of January 1, 2013. Mr. Stout arrived at his market values for the subject property by considering the loss in value due to economic and functional obsolescence including, but not limited to, the subject facility's size, multiple-level floor layouts, and area in shell condition.
 

 27. Mr. Stout did substantially dispute the County's assessment of $147,609,250 for the subject property as of January 1, 2012, and the County's assessment of $152,183,290 for the subject property as of January 1, 2013.
 

 28. The discrepancy between the values assigned to the subject property by the County Board and Mr. Stout's market values is due to (a) the County's arbitrary
 
 *820
 
 classification of the subject property as a special-purpose property when applying the cost approach to develop its assessments; (b) the County's failure to consider acceptable appraisal methodology to determine the loss in value due to economic and functional obsolescence associated with the subject property that Mr. Stout did consider when applying his analysis to determine the market values for the subject property; and (c) the County's focus on the special use of the subject property by Corning, which caused the County to implicitly value the property at the subjective worth to Corning and not at the objective value to a[ ] willing buyer.
 

 (Footnotes omitted). The Commission then entered the following conclusions of law:
 

 1. Corning's evidence from Mr. Stout, taken alone and by itself, tends to show that the County's methods are arbitrary or illegal due to (a) the County's classification of the subject property as a special-purpose property; (b) the County's failure to consider acceptable appraisal methodology to show loss in value due to economic and functional obsolescence associated with the subject
 
 *685
 
 property; and (c) the County's focus on the specific use of the subject property, which caused the County to implicitly value the subject property at the subjective worth to Corning and not at the objective value to a willing buyer.
 

 2. Corning thus rebutted the presumption of correctness of the two assessments at issue, and the burden shifted to Cabarrus County to demonstrate that its methods produced the true values for the subject property as of January 1, 2012 and January 1, 2013.
 

 3. Cabarrus County did not carry its burden when it failed to demonstrate that its appraisal methodology produced true values in view of both sides' evidence and the weight and sufficiency of the evidence, the credibility of the witnesses, and inferences as well as conflicting and circumstantial evidence; and thus its methods are arbitrary or illegal.
 

 The Commission implicitly adopted Mr. Stout's valuation and lowered the assessed values for each of the two tax years to the values urged by Corning. The County appeals.
 

 II. Discussion
 

 Our review is governed by N.C. Gen.Stat. § 105-345.2, which provides in pertinent part as follows:
 

 (b) So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The Court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
 

 (1) In violation of constitutional provisions; or
 

 (2) In excess of statutory authority or jurisdiction of the Commission; or
 

 (3) Made upon unlawful proceedings; or
 
 *686
 
 (4) Affected by other errors of law; or
 

 (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted; or
 

 (6) Arbitrary or capricious.
 

 N.C. Gen.Stat. § 105-345.2(b) (2015).
 

 The proper standard of review "depends upon the particular issues presented on appeal."
 
 Amanini v. N.C. Dep't of Human Res.,
 

 114 N.C.App. 668
 
 , 674,
 
 443 S.E.2d 114
 
 , 118 (1994) (citation omitted). Where a petitioner argues that the Commission's decision was affected by an error of law, we apply a
 
 de novo
 
 review.
 
 In re Appeal of Greens of Pine Glen Ltd. P'ship,
 

 356 N.C. 642
 
 , 647,
 
 576 S.E.2d 316
 
 , 319 (2003). " 'Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal."
 
 State v. Williams,
 

 362 N.C. 628
 
 , 632-33,
 
 669 S.E.2d 290
 
 , 294 (2008) (quoting
 
 Greens of Pine Glen,
 

 356 N.C. at 647
 
 ,
 
 576 S.E.2d at
 
 319 ). We apply the "whole record" test to determine whether the Commission's decision is supported by competent, material, and
 
 *821
 
 substantial evidence.
 
 Greens of Pine Glen,
 

 356 N.C. at 647
 
 ,
 
 576 S.E.2d at 319
 
 . "The 'whole record' test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence."
 
 In re Rogers,
 

 297 N.C. 48
 
 , 65,
 
 253 S.E.2d 912
 
 , 922 (1979) (citations omitted).
 

 The "whole record" test does not allow the reviewing court to replace the [Commission's] judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it
 
 de novo.
 
 On the other hand, [it] requires the court, in determining the substantiality of evidence supporting the [Commission's] decision, to take into account whatever in the record fairly detracts from the weight of the [Commission's] evidence.... [T]he court may not consider the evidence which in and of itself justifies the [Commission's] result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.
 

 Thompson v. Wake Cnty. Bd. of Educ.,
 

 292 N.C. 406
 
 , 410,
 
 233 S.E.2d 538
 
 , 541 (1977) (citations omitted).
 

 In North Carolina,
 
 ad valorem
 
 tax assessments are conducted under a uniform standard. A county must appraise all real and personal
 
 *687
 
 property "at its true value in money," which is its "market value." N.C. Gen.Stat. § 105-283 (2015). "Market value" is defined by statute as the estimated price
 

 at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.
 

 Id.; see also
 

 In re Appeals of S. Ry. Co.,
 

 313 N.C. 177
 
 , 188,
 
 328 S.E.2d 235
 
 , 243 (1985) (holding that appraisals "from the perspective of the present owner to the exclusion of the willing buyer were in clear violation of the statutory 'market value' standard");
 
 In re Ad Valorem Valuation of Prop. in Forsyth Cnty.,
 

 282 N.C. 71
 
 , 80,
 
 191 S.E.2d 692
 
 , 698 (1972) ("To conform to the statutory policy of equality in valuation of all types of properties, the statute requires the assessors to value all properties, real and personal, at the amount for which they, respectively, can be sold in the customary manner in which they are sold.").
 

 "An important factor in determining the property's market value is its highest and best use."
 
 In re
 

 Appeal of Belk-Broome Co.,
 

 119 N.C.App. 470
 
 , 473-74,
 
 458 S.E.2d 921
 
 , 923 (1995) (citing
 
 Rainbow Springs P'ship v. Cnty. of Macon,
 

 79 N.C.App. 335
 
 ,
 
 339 S.E.2d 681
 
 (1986) ),
 
 aff'd per curiam,
 

 342 N.C. 890
 
 ,
 
 467 S.E.2d 242
 
 (1996). "Highest and best use" has been defined as "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Inst.,
 
 The Appraisal of Real Estate
 
 297 (11th ed.1996). It "is not determined through subjective analysis by the property owner, the developer, or the appraiser; rather, highest and best use is shaped by the competitive forces within the market where the property is located."
 

 Id.
 

 at 298
 
 .
 

 A. Corning's Burden
 

 We first address the County's argument that Corning failed to produce competent, material, and substantial evidence tending to show that the County used an arbitrary or illegal method of valuation.
 

 A county's
 
 ad valorem
 
 tax assessment is presumptively correct.
 
 In re
 

 Appeal of Amp Inc.,
 

 287 N.C. 547
 
 , 562,
 
 215 S.E.2d 752
 
 , 761 (1975). To rebut this presumption, the taxpayer must produce "competent, material and substantial evidence" which tends to show that the county used
 
 *688
 

 either
 
 (1) an arbitrary
 
 or
 
 (2) illegal method of valuation,
 
 and
 
 (3) "the assessment substantially exceeded the true value in money of the property."
 
 Id.
 
 at 563,
 
 215 S.E.2d at
 
 762 ;
 
 see also In re Appeal of
 

 IBM Credit Corp. (IBM Credit I),
 

 186 N.C.App. 223
 
 , 226,
 
 650 S.E.2d 828
 
 , 830 (2007) (citations omitted) (clarifying that the taxpayer's burden "is one of production and not persuasion"),
 
 aff'd per curiam,
 

 362 N.C. 228
 
 ,
 
 657 S.E.2d 355
 
 (2008). If the taxpayer successfully rebuts the initial presumption,
 
 *822
 
 the burden shifts back to the county to " demonstrate that its methods produce true values."
 
 In re Appeal of Parkdale Mills,
 

 225 N.C.App. 713
 
 , 717,
 
 741 S.E.2d 416
 
 , 420 (2013) (citing
 
 In re Appeal of
 

 IBM Credit Corp. (IBM Credit II),
 

 201 N.C.App. 343
 
 , 345,
 
 689 S.E.2d 487
 
 , 489 (2009) );
 
 see also
 

 S. Ry.,
 

 313 N.C. at 182
 
 ,
 
 328 S.E.2d at 239
 
 (explaining that the taxing authority has the final "burden of going forward with evidence and of persuasion").
 

 A method of valuation is illegal if it does not result in "true value," as defined under N.C. Gen.Stat. § 105-283.
 
 S. Ry.,
 

 313 N.C. at 181
 
 ,
 
 328 S.E.2d at 239
 
 (citations omitted). Our decisions have further held that an illegal appraisal methodology is also arbitrary.
 
 In re Appeal of Blue Ridge Mall LLC,
 

 214 N.C.App. 263
 
 , 269,
 
 713 S.E.2d 779
 
 , 784 (2011) ;
 
 In re Appeal of Lane Co.,
 

 153 N.C.App. 119
 
 , 124,
 
 571 S.E.2d 224
 
 , 227 (2002).
 

 In this case, the Commission concluded that "Corning's evidence from Mr. Stout, taken alone and by itself, tends to show that the County's methods are arbitrary or illegal...." Mr. Stout's research revealed that "Corning is the only major company that still produces optical fiber in the United States and North America." The cost of labor has driven the majority of fiber optic manufacturers overseas, and even if Corning's facility was put on the market, those manufacturers "would not come here because [the cost] of labor is just too high." Based in part on the lack of market demand for fiber optics manufacturing facilities, Mr. Stout concluded that the highest and best use of the property, as vacant, would be future industrial use, and as improved, would be continued industrial use. He explained that
 

 [a]s improved, we realize that, you know, the highest and best use would be continued use as the fiber optic manufacturing plant, but under the market value premise, what we found was there is no demand for either building or buying a fiber optic manufacturing facility. We found no evidence in market in North America that there was a competitor who would be willing to come up and buy this plant for continued fiber optic manufacturing.... And there are other fiber optic producers, but no one of this magnitude.
 

 *689
 
 While Mr. Stout appreciated the unique features of the improvements, he did not consider the property to be special-purpose property:
 

 [A]lthough there-this is a unique property, that the County considers this special purpose, it's really not. This is what we call a limited market property. There are adaptive reuse. They wouldn't level this if they left it. They would-someone would come in and use what we feel is the functional useable area of that, so we feel like the highest and best use as improved would be for continued industrial use.
 

 Although the improvements would have to be retrofitted for a different use, Mr. Stout opined that the property would have value to an alternative industrial user:
 

 A: There would be a market for it at a certain price, which I believe the price that I put on it could be sold to an alternative user. And through my career, I've done a lot of adaptive reuse, and certainly this isn't a building that would be scrapped. It would be cost prohibitive. So the most likely alternative user, they'll find some industrial user at a price, and my sales reflected a much lower price than this. But there is a market for adaptive reuse, but they wouldn't use those other floors.
 

 Q: Would it be fair to say that these alternative users that you envision for the property would need to adapt it for their own use?
 

 A: Yes.
 

 Q: And would that mean they'd have to spend some money on it to make it useful to them?
 

 A: Most conversion of manufacturing plants, that's what we call limited market properties because all of them have to do that, all manufacturing in the first generation in specialized properties. The second generation will have to do certain gutting and retrofitting to meet their manufacturing processes.
 

 Q: Then, of course, after they do that, it really wouldn't be necessarily useful to another alternative user.
 

 *823
 
 A: Well, the next alternative user would do the same thing. They'll come and gut those things that don't work for
 
 *690
 
 them and convert it, and we have plenty of evidence of that market.
 

 Q: But once they do that, once they do that adaptation and spend that money, it would have value to them to be able to use it for the purpose for which they intended.
 

 A: Correct.
 

 Q: So do I understand you to be saying basically that this particular property just needs to be valued as a generic manufacturing or warehouse facility for tax purposes; is that correct?
 

 A: Well, under my understanding, the definition, the way I interpret it, it has to sell between a willing buyer and a willing-there has to have been a change. It's not to this specific user. It's not a use value or value of use. Under those premises, that's the way we valued it.
 

 Under the assumption that the highest and best use would be for continued industrial use, Mr. Stout proceeded with his property analysis. He estimated that 536,285 square feet of the 1,208,996 gross square feet of the improvements was "functional rentable or usable area for adaptive reuse or alternative use," which included the lower level of the processing area and half of the second floor. A large portion of the facility was "vacant shell space": As of 1 January 2012, 38 percent of the gross square footage, and 34 percent of the total functional rentable area, was in shell condition. As of 1 January 2013, those estimates had been reduced to 26 percent and 31 percent, respectively, due to some additional up-fit.
 

 Mr. Stout assigned no value to the third and fourth floors of the facility because "industrial users typically don't recognize multistory buildings.... And although there are some users that use second-level space, it's rare that you see any that are three and four stories...." The property also had a "number of ancillary buildings that are used specifically for Corning's process which ... would not have any value to any other user." Three different brokers agreed with Mr. Stout's opinion regarding the value of the multi-story design and ancillary buildings. The first broker "was not familiar with any recent multi-floor industrial sales." He would give "some value" to the second floor, "no value" to the third and fourth floors, and "little to no value" to the ancillary buildings in the rear of the site. The second broker opined that the "upper floors in [the] production warehouse would get no value on [the] resale market," and that the ancillary buildings "have little value." The third broker simply
 
 *691
 
 stated, "Multi-story industrial buildings are functionally obsolete." Mr. Stout viewed the brokers' comments as "reflective of what's going on in the market for industrial properties."
 

 Mr. Stout initially valued the property under all three methods of valuation, but ultimately used a blended cost-sales approach, assigning 75 percent of the weighted average to the cost and 25 percent to the sales comparison. He explained his consideration of these two approaches in his report:
 

 The cost approach is most reliable for newer properties that have no significant amount of accrued depreciation. The subject is not new construction, and there is a relatively active market for land sales in the area. The subject was specifically built for Corning, Inc. and has a number of building components that are not suitable for alternative industrial users. As a result, the property suffers from a significant amount of functional/external obsolescence. Although significant adjustments for functional/external obsolescence reduce the reliability and credibility of the approach, this approach would be given consideration due to the quality of the improvements.
 

 The sales comparison approach is most reliable in an active market when an adequate quantity and quality of comparable sales data are available. In addition, it is typically the most relevant method for owner-user properties, because it directly considers the prices of alternative properties with similar utility for which potential buyers would be competing. There is a reasonably active market for industrial properties, and this approach most closely reflects buyer behavior. Accordingly, the sales comparison approach is given weight in the value conclusion.
 

 *824
 
 He did not give weight to the income approach, however, because "[a]n owner-user is the most likely purchaser of the appraised property, and the income capitalization approach does not represent the primary analysis undertaken by the typical owner-user."
 

 Using his cost approach, Mr. Stout began with an estimated replacement cost of $75,702,482. He then subtracted $20,766,391 for age-life depreciation and $28,917,261 for functional and external obsolescence. After adding $3,850,000 for the land value, Mr. Stout valued the property at $29,870,000 as of 1 January 2012. He used the same formula to value the property at $35,300,000 as of 1 January 2013, which was slightly
 
 *692
 
 higher due to interim up-fit. Under his sales comparison approach, Mr. Stout identified four transactions involving similar industrial properties in the region during the relevant time period. The sales indicated an average adjusted value of $33.00 per square foot. Recognizing once again the obsolescence associated with the multi-story structure and ancillary buildings, Mr. Stout applied the average rate to only the functional rentable area of 536,285 square feet. He made further adjustments for capital expenditures and arrived at the value of $15,870,000 and $16,040,000 for Tax Years 2012 and 2013, respectively. Finally, after assigning the appropriate weight to each approach, Mr. Stout valued the property at $26,370,000 for Tax Year 2012 and $30,490,000 for Tax Year 2013.
 

 On more than one occasion at the hearing, Mr. Stout testified that he used the "true value" appraisal standard and that his valuation was "consistent with the concept of value-in-exchange." The following testimony shows that while he considered Corning's current use of the property in his analysis, he valued the property from the standpoint of a likely buyer:
 

 Q: Now, in your appraisal, you didn't really consider the use that it's presently being used for, did you?
 

 A: Well, of course, I did. That was in my replacement cost I did.
 

 Q: And presently it's being used by Corning-
 

 A: That's correct.
 

 Q:-is that correct? And it's being used for the same purpose for which it was constructed-
 

 A: That's correct.
 

 Q:-is that correct? And that is, in fact, the use that would be considered among all the other uses, is it not?
 

 A: Well, considering they're the only major employer or manufacturer of optical fiber, there are no other likely buyers out here for that type of use.
 

 ....
 

 Q: Well, wouldn't it be fair to say that the highest and best use of this property as of 2012 or 2013, either one, was the very use that was being made of it at that time? Wouldn't that be the highest and best use?
 

 *693
 
 A: Well, the purpose of true value is you're looking at that value in exchange, so I'm not looking at a value and use to Corning or a use value, who is that alternative user, were they willing to pay, so it has to be between a willing-and there are no potential buyers in North America we are aware of that are of this magnitude. There are other manufacturers, but none of this size.
 

 Q: Well, then, would it be fair to say that overall, your appraisal is for an alternative industrial user, not for Corning?
 

 A: That's correct.
 

 Based on the foregoing, we conclude that Corning met its initial burden to produce competent, material, and substantial evidence tending to show that the County used an arbitrary or illegal method of valuation and the assessments substantially exceeded the true value of the property. Specifically, Mr. Stout's report and testimony tended to show that the property was not special-purpose property, but rather a "limited-market" property which had value to an alternative industrial user. At the same time, he acknowledged the obsolescence associated with the multi-story design, the improvements in shell condition, and the ancillary buildings. Most importantly, he priced the property based on its value in-exchange, recognizing that Corning's use of the facility was not a dispositive factor because there was no market
 
 *825
 
 demand for fiber optic manufacturing facilities.
 

 B. The County's Burden
 

 Next, we must determine whether the County met its subsequent "burden of going forward with the evidence and of persuasion."
 
 S. Ry.,
 

 313 N.C. at 182
 
 ,
 
 328 S.E.2d at 239
 
 . In this final stage of the burden-shifting framework, the critical inquiry is whether the County's valuation approach "is the proper means or methodology" to produce "true value" based on the characteristics of the subject property.
 
 IBM Credit II,
 

 201 N.C.App. at 349
 
 ,
 
 689 S.E.2d at 491
 
 (internal quotation marks omitted). The Commission has a duty " 'to hear the evidence of both sides, to determine its weight and sufficiency and the credibility of witnesses, to draw inferences, and to appraise conflicting and circumstantial evidence, all in order to determine whether the [County] met its burden.' "
 

 Id.
 

 (quoting
 
 S. Ry.,
 

 313 N.C. at 182
 
 ,
 
 328 S.E.2d at
 
 239 ). In this part of our discussion, we also address the County's challenges to Findings of Fact Nos. 15, 17-19 and 28 as being contrary to the evidence.
 

 *694
 
 The Commission concluded that the County "did not carry its burden when it failed to demonstrate that its appraisal methodology produced true values." At the hearing, Mr. Weisner explained that when the facility closed in 2002, the County reduced the assessed value from $172 million to $51 million "because at that point in time it was a special purpose building that was no longer being used for its special purpose, so ... [the] only thing you could do with it is adapt it to some other use." The County " looked at the possibility of having to sell it to a secondary user as opposed to looking at ... the replacement cost to produce the fiber that it was designed to produce." When the facility resumed production, the County "took off all of the obsolescence that [it] applied earlier when [Corning] was out of business and there was no market for the fiber ... and that allowed the value to float back up to a higher value." As Mr. Weisner confirmed, "the reason the value increased by almost three times was because Corning started using the facility again to manufacture product."
 

 Relying solely on the cost approach, Mr. Weisner testified that the County did not assign any functional or economic obsolescence to the property in Tax Year 2012 or 2013. When asked how he would know what a willing buyer would pay for the subject property without factoring in obsolescence, Mr. Weisner testified that
 

 we're calling it a special purpose property,
 
 so we're looking at any obsolescence that may occur due to ... its ability to produce the product that it was designed to produce.
 
 This is the most modern plant in the world that produces this particular type of fiber, and when you walk through this plant and you look at this plant, it is fully in operation, there's-equipment is covering all the floors,
 
 it's being used exactly as it was designed to be used, so there was no, in our opinion, no functional obsolescence to the building.
 

 (Emphasis added.) Mr. Weisner also agreed with Commissioner Morgan, however, that obsolescence would be inherent to specialty property. When Commissioner Morgan asked how that obsolescence is measured in the County's system, Mr. Weisner explained he would adjust for functional obsolescence "if the plant stopped producing-if there was no longer any valid use for that building to produce its product that it was designed to produce, then that's the time that we would look at all the secondary uses that it could be put to, and we would-we certainly would increase its functional obsolescence."
 

 *695
 
 In his appraisal report, Mr. Berkowitz referenced the uniform appraisal standard set forth in N.C. Gen.Stat. § 105-283 and offered the statutory definition of "true value." The subsequent paragraph in the appraisal, however, seems to add to that definition the following caveat:
 

 The most significant factor with respect to the subject is that a substantial portion of the improvements are specific to the operations of the property as a fiber optic manufacturing plant. We consider it unlikely that many of the physical characteristics of the primary building would be constructed for any other use. The "reasonable
 
 *826
 
 knowledge" as mentioned in the definition of true value is applicable to the current and historic use of the facility as a fiber optic manufacturing plant.
 

 At the hearing, Mr. Berkowitz offered an explanation of the foregoing paragraph:
 

 A: That there are some small variances with respect to the definitions, and the one most pertinent with respect to the valuation is the latter half of that definition in saying that both the buyer and seller have a reasonable knowledge of all the uses to which the property is adapted and for which it's capable of being used.
 

 Q: And what does that mean to you?
 

 A: To me,
 
 I think it identifies specifically special use properties in that if they are specifically designed for intended use and are being used as such, then it should be valued as such.
 

 (Emphasis added.)
 

 Mr. Berkowitz and Mr. Harris determined that the highest and best use of the property would be "its continued use as a fiber optic manufacturing facility, with the limited possibility of expansion as market conditions improved." Their highest and best use analysis suggests that they reached this determination based on Corning's use of the property:
 

 The market for large manufacturing facilities is limited. However, the information provided by Corning with respect to new fiber optic cable manufacturing facilities indicates that the design of the improvements is somewhat outdated.
 
 Regardless, the property owner continues to use the manufacturing portion of the property for its
 

 *696
 

 intended use. Therefore, the highest and best use of the property as improved is for continued use as a fiber optic manufacturing facility with the possibilities of expansion depending on market conditions.
 

 (Emphasis added.) At the hearing, Mr. Berkowitz confirmed the focus of the County's highest and best use analysis: "[I]n consideration of how it was used for the special purpose for which it was designed, the highest and best use would be for continued use as a fiber optic manufacturing facility." If not simultaneously, Mr. Berkowitz subsequently concluded that the property was special-purpose property because "it has unique design characteristics that are specific to the intended use that it is being used for."
 

 Nevertheless, the County takes exception to the Commission's finding that "when relying on the cost approach, Cabarrus County classified the subject property as a special-purpose property," insisting that it "considered" the property to be "special-purpose" but did not "classify" the property as such for special treatment under its schedule of values. As Corning correctly notes, however, this argument is semantic rather than substantive. In context, the Commission's finding explains how the County came to rely on the cost approach. Ultimately, the record amply demonstrates that the County determined the property was special-purpose property, which helped form the foundation for its methodology. Mr. Weisner stated, "[W]e feel like it's a special purpose property and the best approach is the cost approach." Mr. Berkowitz testified, "Special purpose properties by definition have unique characteristics for which they're designed for their intended use. The most applicable methodology with respect to valuing those properties is the cost approach." Mr. Harris's appraisal report similarly concludes, "The subject is considered a 'special purpose' property. As such, the cost approach is considered the most reliable indicator of value. For this appraisal, we include a cost approach only."
 

 We also acknowledge that to some extent it may be true, as the County contends, that it used the cost approach due to the lack of comparable sales data. By insisting that the highest and best use was for manufacturing optical fiber, however, the County pigeon-holed the property into a market with no user-owner demand, and thus, no comparable sales. Mr. Weisner testified that "there's not really good comparables to tell you the true value of this property as it's being used as a fiber optics plant. So then that drives us to the cost approach to look at-because it is special purpose." Mr. Berkowitz's testimony also demonstrates how his highest and best use analysis effectively precluded consideration of alternative use:
 

 *827
 

 *697
 
 A: We did consider the sales comparison approach, but we felt that the sales that were in the market, none of them included fiber optic manufacturing facilities, and that any adjustments would be misleading as far as the conclusions from a sales comparison approach.
 

 Q: You just looked at fiber optics?
 

 A: That's correct.
 

 Q: And the reason for that is?
 

 A: Because in using sales that were not this design would be misleading.
 

 Q: Do you consider there to be alternate users for this property?
 

 A: Not under its highest and best use.
 

 Q: Do you consider there to be any way that this property could be positioned in the market to be used by others than a fiber optic manufacturer?
 

 A: It could be.
 

 Q: What would be some of those things that could be done to make it usable for others?
 

 A: Well, usable for others?
 

 Q: For other manufacturers.
 

 A: That would be inconsistent with its highest and best use.
 

 Q: The highest and best use is as fiber optic manufacturing?
 

 A: Yes.
 

 Q: What analysis did you do to determine that this was the most profitable return on this use of this property, maximally productive, the standard, in other words?
 

 A: Yes. It would be the highest and best use because it would return-make the highest return to the investor. If you're using it and adapting it for another use, inherently there would be more economic and functional obsolescence of the building.
 

 *698
 
 Q: Are you valuing this property, sir, to Corning, Incorporated?
 

 A: I'm valuing it under its highest and best use.
 

 While the County maintains that the highest and best use of the property was for manufacturing optical fiber, each of the County's experts recognized that there was no market for the same. Mr. Harris testified that he researched national markets for fiber optics manufacturing facilities in preparing the appraisal report, and when asked if there was a national market for those facilities, he responded, "No." Mr. Berkowitz reached the same conclusion, though he posited that the property would still be attractive to "an investor." When asked if he conducted any research to determine whether there had been investor acquisitions of similar "large industrial facilities," Mr. Berkowitz admitted, "I didn't." In a similar effort to defend the County's position, Mr. Weisner's testimony also fell short:
 

 Q: As you sit here today before the Commission, is it the position of the County that the value that a willing buyer would pay for this property as of 1/1/2012 is $147 million and change?
 

 A: Yes. To use it as a fiber optics manufacturing plant, yes.
 

 Q: And is it the position of the County that a willing buyer would pay approximately $152 million for the property as of January 1, 2013?
 

 A: Yes.
 

 Q: Okay. And can you identify for us who that buyer is, hypothetical or real, that would pay that amount of money for this facility?
 

 A: Somebody that wanted to use the facility for the purpose in which it was intended to be used.
 

 Q: And have you identified anybody actually active in the economy that would want to buy this facility for that specific use you just identified?
 

 A: I have not.
 

 Based on the foregoing, we conclude that the Commission's findings are supported by competent, material, and substantial evidence, and the Commission's decision has a rational basis in the evidence. The evidence shows that the County's highest and best use analysis was
 
 *699
 
 based on Corning's use of the property, rather than its value to a willing buyer. The same subjectivity was evident in the County's classification of the property as special-purpose property. Consequently, the County used the cost approach but failed to account for obsolescence which, in the Commission's discretion, should have been deducted
 
 *828
 
 in light of Mr. Stout's testimony. Moreover, while the County determined the highest and best use of the property was for manufacturing optical fiber, the testimony from its own experts reveals its failure to use a valuation method that reflects what willing buyers in the market for fiber optics manufacturing facilities would pay for the property.
 
 See
 

 Belk-Broome,
 

 119 N.C.App. at 474
 
 ,
 
 458 S.E.2d at 923-24
 
 (concluding that where property's highest and best use was "its present use as an anchor department store," the County was "required to use a valuation methodology that reflects what willing buyers in the market for anchor department stores will pay for the subject property").
 

 C. Affected by Other Errors of Law
 

 The County also argues that the Commission's Final Decision was affected by errors of law. Throughout its brief, the County maintains that Corning's valuation, as adopted by the Commission, is contrary to the existing law because it did not appraise the property "based on what is there and how it is being used." Instead, it is "based on a hypothetical, potential generic industrial buyer purchasing a closed and vacant property."
 

 The County insists on valuing the property by its value in-use despite our uniform appraisal standard for valuation at fair market value. N.C. Gen.Stat. § 105-283. Value in-use is relevant to fair market value in that an owner's current use of the property may be indicative of its economic utility, and therefore, its value to a potential buyer. Our statutes actually direct appraisers to consider the adaptability of real property and improvements for commercial, industrial, or other uses. N.C. Gen.Stat. § 105-317(a)(1) & (2) (2015). Inevitably, this also "requires consideration of its declining attractiveness for such use."
 
 Prop. in Forsyth Cnty.,
 

 282 N.C. at 78
 
 ,
 
 191 S.E.2d at 697
 
 . As the evidence overwhelmingly shows that the property could not have been sold as a fiber optics manufacturing facility, Corning's current use of the property has no bearing on its value to a potential buyer.
 
 See
 

 Parkdale Mills,
 

 225 N.C.App. at 720
 
 ,
 
 741 S.E.2d at 421-22
 
 (explaining that the Commission's emphasis on the taxpayer's current use of the facility implicitly allowed the County to value the property at its subjective worth to the taxpayer, which "is obviously not the same as adequately determining the objective value of these properties to another willing buyer.")
 

 *700
 
 Next, the County argues that case law requires special-purpose facilities to be valued at cost, and therefore, the Commission erred as a matter of law in adopting Mr. Stout's blended cost-sales approach to arrive at its final value.
 

 In support of its argument, the County cites to the Commission's findings in
 
 In re Appeal of Federal Reserve Bank of Richmond,
 
 92 PTC 152 (1994), a prior decision which was not appealed to this Court. In that case, the Commission found that "[b]ased upon the specific features of this facility, the highest and best use of the subject property is as a special purpose building," and "[s]pecial purpose buildings are most accurately appraised at a cost of reproduction or replacement." Even assuming that decision has precedential value here, which it does not, the County's attempt to analogize the facts of that case to those
 
 sub judice
 
 is misplaced. Here, the Commission recognized that one of the flaws in the County's cost approach method was its initial designation of the property as special-purpose property. In arguing that the Commission failed to follow case law requiring special-purpose property to be valued at cost, therefore, the County relies on a faulty premise, i.e., that this was specialty property.
 

 No other case offered by the County requires special-purpose property be valued exclusively at cost. The County cites to
 
 In re Appeal of Philip Morris,
 

 130 N.C.App. 529
 
 ,
 
 503 S.E.2d 679
 
 (1998), where the taxpayer argued unsuccessfully that the appraiser's cost approach method was not designed to determine market value of the specialty property based on a hypothetical arms-length transaction.
 
 Id.
 
 at 537,
 
 503 S.E.2d at 684
 
 . This Court noted that experts from both parties agreed, "where, as here, evidence of comparable sales is not readily available, the cost approach is the most accepted method of determining true value."
 

 Id.
 

 Contrary to the County's assertion, that statement was not a
 
 *829
 
 holding of our Court; it was simply a fact agreed upon by the expert witnesses. Nowhere in
 
 Philip Morris
 
 does this Court hold that specialty property must be valued exclusively at cost.
 

 The County's reliance on
 
 Belk-Broome
 
 fares no better. While
 
 Belk-Broome
 
 noted instances where the cost approach may be appropriate, e.g., "for specialty property or newly developed property," we further explained that
 

 when applied to other property, the cost approach receives more criticism than praise. For example, the cost approach's primary use is to establish a ceiling on valuation, rather than actual market value. It seems to be
 
 *701
 
 used most often when no other method will yield a realistic value. The modern appraisal practice is to use cost approach as a secondary approach " because cost may not effectively reflect market conditions."
 

 Belk-Broome,
 

 119 N.C.App. at 474
 
 ,
 
 458 S.E.2d at 924
 
 (citations omitted). Again, nowhere in
 
 Belk-Broome
 
 does this Court hold that specialty property must be valued exclusively at cost. Our statutes require that property be assessed at its true value, N.C. Gen.Stat. § 105-283, and while experts may opine that the cost approach is an appropriate method for assessing true value of a specialty property, our case law does not necessarily demand the same.
 
 See
 

 Greens of Pine Glen,
 

 356 N.C. at 648
 
 ,
 
 576 S.E.2d at 320
 
 ("In light of the innumerable possible situations that may arise, authorities that have the obligation of assigning a value to land sensibly are given discretion to apply the method that most accurately captures the 'true value' of the property in question.").
 

 In addition, the County challenges the Commission's finding that the County's application of its schedule of values, standards, and rules was flawed because it "provided no category for the assessment or appraisal of the subject facility as special-purpose property." According to the County, there is no factual basis for this assertion and no support for it in the law.
 

 Corning challenged the assessments based,
 
 inter alia,
 
 on the County's failure to follow the uniform appraisal methods and its schedule of values. N.C. Gen.Stat. § 105-317 states that "it shall be the duty of the assessor to see that ... [u]niform schedules of values, standards, and rules to be used in appraising real property at its true value ... are prepared and are sufficiently detailed to enable those making appraisals to adhere to them in appraising real property." N.C. Gen.Stat. § 105-317(b)(1) (2015). The County's schedule of values, standards, and rules, however, provides no guidance for the appraisal or assessment of special-purpose property. While the subheading in Chapter 9-"valuation of special properties"-seems promising, it describes only how the County values mobile home parks and cemeteries. At the hearing, when asked if there was "anything in the County's schedule of values that's specific to what the County has termed special purpose properties," Mr. Weisner replied, "I don't believe there is." He also testified that due to the superadequacy and obsolescence associated with technology changes, the County "appraise[d] it as a heavy manufacturing building. So instead of trying to develop a schedule of values on this fiber optics building at $420 a square foot, we chose to price them at our base price for an
 
 *702
 
 excellent quality heavy manufacturing facility." Accordingly, we reject the County's argument.
 

 Turning now to the County's final argument, the County challenges Mr. Stout's opinion regarding the highest and best use of the property, which was implicitly adopted by the Commission. According to the County, the Commission's finding as to the highest and best use of the property is "fatally flawed" for three reasons.
 

 First, the County avers that the Commission's finding does not follow the law as enunciated in
 
 Belk-Broome,
 
 where the parties agreed that the highest and best use of the subject property was "its present use as an anchor department store."
 
 Belk-Broome,
 

 119 N.C.App. at 474
 
 ,
 
 458 S.E.2d at 923
 
 . It is not clear what "enunciated law" the County is referencing. But to the extent the County contends that this factual stipulation should be treated as a rule of law, we disagree. We see no basis in
 
 Belk-Broome
 
 or elsewhere to
 
 *830
 
 hold that current use necessarily equates to highest and best use, especially under the facts of this case.
 

 Second, the County argues that if the highest and best use of the facility is a vacant industrial facility, then the up-fit would have no additional value to an alternate industrial user. According to the County, therefore, the discrepancy between Mr. Stout's assigned values for Tax Years 2012 and 2013 is further evidence that the highest and best use of the property is its current use as a fiber optics manufacturing facility. This argument is not based on legal error. Instead, the County is asking this Court to reweigh the evidence of the highest and best use. It is the Commission's duty, however, to resolve conflicts in the evidence and weigh the credibility of the witnesses.
 
 Rainbow Springs,
 

 79 N.C.App. at 343
 
 ,
 
 339 S.E.2d at 686
 
 . Because "[t]he Commission's judgment 'as between two reasonably conflicting views' is supported by substantial evidence', we will not overturn its decision on this ground.
 

 Id.
 

 (quoting
 
 Thompson,
 

 292 N.C. at 410
 
 ,
 
 233 S.E.2d at
 
 541 ).
 

 Third and finally, the County claims that if the highest and best use of the property is to manufacture optical fiber, then Corning would not sell the property for any other use unless it was under duress. As such, it would not be a "willing seller" as required by N.C. Gen.Stat. § 105-283. The County ignores the fact that the highest and best use, as found by the Commission, is future industrial use. It disregards the evidence which amply demonstrates there is no market for a fiber optic manufacturing facility in North America, much less in North Carolina. And it speculates that Corning would be a "willing seller" if and only if it sold the property in a market with no willing buyer. There is no support for this argument in the law or the facts of this case.
 

 *703
 

 III. Conclusion
 

 Based on the foregoing, we conclude that the Commission's Final Decision is supported by competent, material, and substantial evidence in view of the whole record, and was not affected by errors of law. The Final Decision is affirmed.
 

 AFFIRMED.
 

 Judges HUNTER, JR. and DAVIS concur.